UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DASHANTE JONES, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 3:15-cv-1135 (DJS) |
| | : | |
| CAPTAIN JOHNSON, WARDEN ERFE, | : | |
| ANN CORNOYER, A.R.C. MOSES, | : | |
| CAPTAIN MORINELLI | : | |
|     Defendants. | : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Dashante Jones, commenced this civil rights action against correctional officials at Cheshire Correctional Institution ("Cheshire") and Northern Correctional Institution ("Northern"). He contends that he was denied religious services while confined in the Administrative Segregation Program in violation of his First and Fourteenth Amendment rights. The defendants have filed a motion for summary judgment. Although informed of his obligation to respond to the motion, the plaintiff has not filed a memorandum in opposition to the motion for summary judgment. For the reasons that follow, the defendants' motion is granted.

I. <u>Standard of Review</u>

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). The moving party may satisfy his burden "by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted). Once the moving party meets this burden, the nonmoving party must set forth specific facts

1

showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He must present such evidence as would allow a jury to find in his favor to defeat the motion for summary judgment. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). The nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

II.  Facts[1]

The plaintiff was first admitted to the custody of the Department of Correction in August 1998. Since then, he has been discharged and readmitted several times and transferred among correctional facilities on multiple occasions. On some occasions after readmission or transfer, the plaintiff received inmate orientation. The orientation procedures sometimes included information on inmate grievance procedures. At each orientation session, the plaintiff received an inmate handbook which included information about inmate grievance procedures.

On May 23, 2014, after being charged with assault on Department of Correction staff, the plaintiff was transferred to Northern and placed in Administrative Segregation, a program for inmates with behavioral problems posing a threat to the safety and security of other inmates and staff who cannot safely be managed in the general population. The program has three phases. Phase I is at Northern, while Phases II and III are at Cheshire. Inmates progress through the

---

[1] The facts are taken from the defendants' Local Rule 56(a) Statements and supporting exhibits. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each denial must include a citation to an affidavit or other admissible evidence. In addition, the opposing party must submit a list of disputed factual issues. D. Conn. L. Civ. R. 56(a)2 and 56(a)3. Although the defendants informed the plaintiff of this requirement, ECF No. 26-11, he has not submitted a Local Rule 56(a)2 Statement. Accordingly, the defendants' properly supported facts are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)2.").

phase program based on their individual behavior and participation in required classes and groups.

For safety and security reasons, inmates in Phase I are not given access to programs offered in the general population. Communal religious services is one such program. Instead, at least once a week, each Phase I inmate is offered personal visits by a chaplain of his faith for religious services. Muslim, Jewish, Catholic, Protestant and Native American chaplains are available.

Department of Correction clinical staff offer a program called "Start Now" to inmates in Phase I of Administrative Segregation. The program consists of 34 sessions. Only three inmates may participate in the program at any time because, during the program, the inmates are confined individually in booths and only three booths are available. Inmates do not participate in this program in a communal setting for safety and security reasons. The booths are located in the visiting area of the prison. The plaintiff did not utilize the booths in connection with the "Start Now" program, but did utilize them for "Prison Rape Elimination Act" training.

The booths are not used for communal religious services. Brian Jackson, the administrative captain at Northern, explained that "it would be administratively and operationally difficult, if not impossible, to offer regular religious services to all A/S Phase I inmates with just three booths." Defs.' Mem. Ex. C, ECF No. 26-5, ¶ 5. There are usually between 20 and 25 inmates in Phase I. The inmates have different faiths and, therefore, different chaplains. The booths can accommodate the Start Now program because there are only a few inmates at any time beginning Phase I. Other inmates are progressing through the program or graduating to Phase II. Using the booths for religious services would be impractical because of the multiple faiths present in the Phase I population and the availability of chaplains to conduct the multiple

services.

As an alternative, Muslim inmates in Phase I have access to personal visits from a Muslim chaplain at least once a week and are allowed to retain possession of a copy of the Quran, a Kufi and a prayer rug. They can pray in their cells and order additional religious reading materials. In addition, they are provided with an alternate diet that conforms to their religious dietary requirements and accommodations are made to meal schedules during Muslim feast and fast days.

On January 6, 2015, the plaintiff was transferred to Cheshire to begin Phase II of the Administrative Segregation Program. Phases II and III are a continuation of the program begun at Northern. Because inmates in Phase II have been identified as having behavioral problems that constitute a threat to institutional safety and security and are not able to be safely managed in the general population, the inmates again are not provided the same programs offered to general population inmates, including communal religious services. As in Phase I, Phase II and III inmates are offered personal visits with a chaplain of their faith at least once per week, have access to religious materials, and can pray in their cells.

Upon admission to Phase II, an inmate is assigned to a small group of 3-4 inmates and remains with that group through Phase III. The inmates in the group have all started the program at approximately the same time and advance through the program together. Group assignment is not based on religion, so multiple religions are represented in any group. Currently, there are 4-6 groups.

In Phase II, each small group attends an anger management program twice per week. The program is conducted by a counselor. In Phase III, a recreation supervisor conducts group social activities for each small group about twice per week. These activities are held in a small

4

room in the Administrative Segregation block. The room, about 14' by 16', cannot safely house more than four inmates and a staff member at one time. The small groups also attend outdoor recreation together.

The Muslim faith requires members to pray five times per day, including at the noon hour. During this time on Fridays, Muslims pray in a congregate service called Jummah. The Jummah mandate is waived for Administrative Segregation inmates because they cannot attend the congregate service. Instead, these inmates can fulfill this prayer obligation by praying on their own. Defs.' Mem. Ex. E, ECF No. 26-7, ¶ 6 & Ex. G, ECF No. 26-9, ¶ 4.

While the plaintiff was confined at Northern, from May 2014 until January 2015, he filed seven grievances. In none of the grievances did the plaintiff complain that he was denied congregate religious services in Phase I or address any other aspect of the Phase I program. The plaintiff was housed in Phases II and III at Cheshire from January through June 2015. On May 11, 2015, the plaintiff filed a grievance complaining that he was wrongfully denied "Friday Jumah [sic]." He stated that attendance is mandatory for Muslims and that Islamic services should be provided in the "Block." Defs.' Mem. Ex. I, ECF No.27 at 15. The grievance was denied initially and on appeal. The plaintiff filed a second grievance on May 15, 2015, in which he claimed that the denial of congregate services violated his Eighth Amendment rights. *Id.*, ECF No. 27 at 18. This grievance was rejected as repetitive.

III.     Discussion

The defendants move for summary judgment on the grounds that the plaintiff failed to exhaust his administrative remedies with regard to all claims for denial of religious services at Northern and claims for total denial of religious services at Cheshire, and fails to show that the defendants violated his First or Fourteenth Amendment rights by denying congregate services.

5

## A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), imposes a requirement that inmates exhaust their administrative remedies before filing an action in federal court concerning any aspect of prison life. *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Section 1997e requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 734 (2001). A claim is not exhausted until the inmate complies with all administrative deadlines and procedures. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement. *See Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). If the deadline to file a grievance about an issue has passed, claims concerning that issue are unexhausted and barred from federal court. *See Woodford*, 548 U.S. at 94-95. In addition, the inmate must exhaust his administrative remedies for each claim he asserts in federal court. *See Baldwin v. Arnone*, No. 3:12cv243 (JCH), 2013 WL 628660, at *5 (D. Conn. Feb. 18, 2013).

An inmate may be excused from the exhaustion requirement only if administrative remedies were not in fact available. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court has identified three circumstances where an administrative remedy, although officially available, cannot be used by inmates to obtain relief. First, the administrative remedy may operate as a "dead end" where the office to which inmates are directed to submit all grievances disclaims the ability to consider them. *Id.* at 1859. Second, the procedures may be so confusing that no ordinary prisoner could be expected to "discern or navigate" the requirements. *Id.* And third, prison officials may "thwart inmates from taking advantage of a grievance process through

machination, misrepresentation, or intimidation." *Id.* at 1860. Courts require inmates to take advantage of each step of an administrative appeal procedure in order to exhaust their administrative remedies. *See, e.g., Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("[G]rievances must now be fully pursued prior to filing a complaint in federal court.").

An inmate in a Connecticut state correctional facility who wishes to file a grievance must follow the procedure set forth in Department of Correction Administrative Directive 9.6. *See* Defs.' Mem. Ex. K, ECF No. 27-2. Under the Directive, full administrative review occurs in steps. First, an inmate must seek to resolve his complaint informally by depositing an Inmate Request Form (CN 9601) in a designated collection box. If the inmate is dissatisfied with the response to his Inmate Request Form or does not receive a response within fifteen days, the inmate may proceed to the second step, which is termed "Level 1 Review." To initiate Level 1 Review, an inmate completes the Inmate Administrative Remedy Form (CN 9602). At this point, the inmate is required to provide evidence that he attempted to informally resolve his grievance by attaching the Inmate Request Form (CN 9601) to the CN 9602. *Id.* at 9.6(6)(C). The inmate also has the option of submitting the CN 9602 without attaching a CN 9601 and providing a "valid reason" why he could not obtain the CN 9601form. *Id.* Level 1 Review must be filed within thirty calendar days from the occurrence or discovery of the cause of the grievance. *Id.* Level 1 Review is undertaken by the Unit Administrator, who must respond to the grievance in writing within thirty days. *Id.* at 9.6(6)(I). An inmate may proceed to the third step, Level 2 Review, within five calendar days of receipt of the Unit Administrator's decision. *Id.* at. 9.6(6)(K). Generally, Level 2 Review takes place before a District Administrator. The Administrator's response, which must be delivered in writing within 30 business days of the receipt of the appeal, must include a statement saying whether the grievance was upheld or

7

compromised or was denied or rejected.[2] *Id.* Level 3 appeals are restricted to challenges to Department of Correction policy or the integrity of the grievance procedure and to appeals of Level 2 grievances to which the District Administrator has failed to respond in a timely manner. *Id.* at 9.6(6)(L).

The defendants have provided evidence that during the time the plaintiff was confined at Northern he filed seven grievances, none of which addressed a denial of religious services. The plaintiff has filed no contrary evidence. The plaintiff did file grievances regarding congregate religious services when he was confined at Cheshire. In the May 15, 2015 grievance he references both Northern and Cheshire. However, this grievance was filed much too late to be considered a proper grievance regarding Northern. Grievances must be filed with thirty days of the occurrence. The plaintiff was transferred to Cheshire on January 6, 2015, and did not file this grievance for over five months. To exhaust his claims regarding Northern, the plaintiff was required to comply with all deadlines. *See Woodford*, 548 U.S. at 90. Thus, referencing Northern in this grievance did not serve to exhaust claims regarding lack of congregate services at Northern. The court concludes that the plaintiff has failed to exhaust his administrative remedies as to his claims involving his confinement at Northern. Consequently, the defendants' motion for summary judgment is granted as to the plaintiff's claims that he was denied religious services at Northern.

Finally, the defendants note that, in his deposition, the plaintiff stated that he was denied all religious services at Cheshire. *See* Defs.' Mem. Ex B, ECF No. 26-4 at 47. In his complaint and in the grievances he filed at Cheshire, the plaintiff references only the denial of congregate religious services. The defendants correctly state that the plaintiff has exhausted his institutional

---

[2] "Any grievance which does not meet the criteria specified in Sections 5(E) (6 and 7) and 6 (A through C) of this Directive may be rejected." ECF No. 27-2 at 9.6(6)(F).

remedies only with regard to a claim of denial of congregate services. Accordingly, to the extent that the plaintiff is attempting to expand his claim, he has not exhausted his institutional remedies. The defendants' motion for summary judgment is granted at to any claim for denial of all religious services at Cheshire. *See Turner v. Goord,* 376 F. Supp. 2d 321, 325 (W.D.N.Y. 2005) (internal quotation marks omitted) (permitting an inmate to litigate claims that were never presented to prison authorities through administrative grievances would "make a mockery of the exhaustion requirement").

The Court next considers the merits of the plaintiff's only exhausted claim, the denial of congregate religious services at Cheshire.

B. First Amendment Right to Freely Exercise Religion

Inmates have a First Amendment right to participate in congregate religious services. *See Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). However, that right is not absolute. *See id.* Prison officials may restrict an inmate's right to freely exercise his religion if the restriction is "reasonable." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). To state a free exercise claim, a prisoner must initially establish "that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006). Once he does that, the burden shifts to the defendants to identify legitimate penological interests to justify the restriction on the prisoner's right to freely exercise his religion. *Id.* at 275. Although the burden shifts to the defendants, the plaintiff remains responsible for establishing that the penological interests identified by the defendants are irrational or illegitimate. *Id.* The Court must then determine whether the challenged decision or regulation is reasonable. The Court does this by considering the four factors set forth in *Turner v. Safley*, 482 U.S. 78, 90-91 (1987). Those factors are:

9

> whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternate means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Salahuddin*, 467 F.3d at 274.

For purposes of their motion for summary judgment, the defendants appear to assume that the plaintiff has a sincerely held religions belief that he is required to attend congregate services. With regard to the first *Turner* factor, the defendants identify institutional safety and security as their legitimate governmental objective. They provide evidence that an inmate is sent to the Administrative Segregation Program because he has been identified as having behavioral problems which pose a threat to the safety and security of other inmates and staff and cannot safely be managed in the general population. As a result, even in Phases II and III the inmates are restricted to small groups of about four inmates who are at the same stage of the program. At no time are they permitted to gather with inmates at different stages of the program.

The defendants provided affidavits from two imams stating that a Muslim inmate is not required to attend the weekly congregate service if he is unable to attend because he is in the Administrative Segregation Program. Instead, he can satisfy his religious obligation by praying in his cell. The plaintiff has access to all articles needed to do so and can obtain additional religious materials and meet privately with an imam at least once a week. Thus, the plaintiff has alternate means to exercise his religion.

The defendants also provide evidence that accommodating the plaintiff's right would be burdensome. Jummah services are held during the noon hour on Fridays. There is only one imam at Cheshire, who already conducts two Jummah services to accommodate the general

population inmates. He cannot conduct any more services. In addition, the number of additional services would be burdensome. For safety and security reasons, Phase II and III inmates are not permitted to associate with prisoners who are not in their small groups, so conducting one service for all Administrative Segregation inmates at Cheshire would not be possible. Group assignments are not based on religion, so a separate service would be required for each group including a Muslim inmate. This could entail an additional 4-6 services, all of which would have to be conducted during the noon hour along with the two current services. The defendants further argue that if congregate services were provided for Muslim Administrative Segregation inmates, comparable services would have to be provided for inmates of all other faiths, requiring many more chaplains and significant financial resources. There are no ready alternatives to accommodate the right to congregate services and satisfy the legitimate penological objective of institutional safety and security.

The defendants have presented evidence satisfying the *Turner* factors. The plaintiff has not opposed the motion and thus has presented no evidence calling any of the defendants' evidence into question. The Court concludes that the defendants' actions were reasonable. The defendants' motion for summary judgment is granted at to the First Amendment free exercise claim. *See In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 470-71 (4th Cir. 1999) (upholding denial of all congregate religious services for segregated inmates where other forms of religious exercise were available).

C. <u>Fourteenth Amendment Right to Equal Protection of the Laws</u>

The Equal Protection Clause protects prisoners from invidious discrimination. This provision does not mandate identical treatment for each individual; rather it requires that similarly situated persons be treated the same. *See City of Cleburne v. Cleburne Living Center,*

*Inc.*, 473 U.S. 432, 439 (1985). Accordingly, to state an equal protection claim, the plaintiff must initially allege facts showing that he is a member of a group that was treated differently compared to other similarly situated individuals. *See Fahs Construction Group, Inc. v. Gray*, 725 F.3d 289, 291 (2d Cir. 2013). The plaintiff also could assert an equal protection claim based on a "class of one" theory. To state a valid claim, the plaintiff must allege first that he was intentionally treated differently from others who are similarly situated. Second, he must allege facts showing that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). He must allege an "extremely high" level of similarity with the person to whom he is comparing himself; their circumstances must be "*prima facie* identical." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled in part on other grounds by Appel v. Spiridon*, 531 F.3d 138, 139 (2d Cir. 2008).

Although the plaintiff contends that the defendants denied him equal protection, he does not identify any similarly situated inmates who were treated differently, *i.e.,* he identifies no Administrative Segregation Phase II or Phase III inmate who was provided congregate religious services. Absent such allegations, the plaintiff cannot state a cognizable equal protection claim under either theory. The defendants' motion for summary judgment is granted as to the Fourteenth Amendment claim.

IV. Conclusion

The defendants' motion for summary judgment [**ECF No. 26**] is **GRANTED**. The Clerk

12

is directed to enter judgment in favor of the defendants and close this case.

Signed this     8th      day of May,  2017 at Hartford, Connecticut.

_____/s/  DJS_____
Dominic J. Squatrito
United States District Judge